## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 19-CR-44-JED |
| v. | ) | |
| | ) | |
| JASON WILLIAM NEAR, | ) | |
| KEVIN MICHAEL WRIGHT, | ) | |
| STEPHANIE MARIE ELFMAN, | ) | |
| | ) | |
| Defendants. | ) | |

## OPINION AND ORDER

### I.     Background

The defendants are charged by Indictment with conspiring to distribute and to possess with intent to distribute 50 kilograms or more of marijuana, in violation of 21 U.S.C. §§ 846, 841(a)(1), (b)(1)(C) (Count One) and possessing with intent to distribute marijuana, in violation of 21 U.S.C. § 841(a)(1), (b)(1)(D) (Count Two).  The charges arose from a traffic stop on February 6, 2019 at the Will Rogers Turnpike Toll Plaza on Interstate 44 (I-44) at Vinita, Oklahoma.

Defendant Jason Near was driving a Recreational Vehicle (RV) at the time he was stopped by Oklahoma Highway Patrol (OHP) Trooper Trenton Short.  Mr. Near's wife, Stephanie Elfman, his cousin, Kevin Wright, and his dog were traveling with Mr. Near in the RV.  Trooper Short asked Near to exit the RV and sit in the front passenger seat of Short's patrol car, which Near did.  Near was thus videoed for virtually the entire law enforcement encounter on I-44.  Short issued Mr. Near a warning for following too closely

in violation of *Okla. Stat.* tit. 47, § 11-310(a).  Short continued questioning Near following the issuance of the warning, then asked for consent to search the RV.  After Near declined to consent, Short called for an OHP K-9 officer to bring a dog to sniff the exterior of the RV for the presence of drugs.  The dog alerted and the officers searched the RV and found approximately 114 pounds of marijuana, as well as firearms and ammunition.

Near, Elfman, and Wright were arrested and transported to the OHP Troop L Headquarters in Vinita.  After the defendants were advised of their *Miranda* rights and signed waivers, they were questioned by officers.  During the questioning, Near and Wright admitted knowingly transporting the marijuana.  Ms. Elfman denied knowledge of the presence of the marijuana or information about drug trafficking.  It is alleged that Near and Wright implicated Ms. Elfman in their statements.

Defendants Elfman and Wright move to suppress the traffic stop, based upon their argument that the Oklahoma traffic statute, *Okla. Stat.* tit. 47, § 11-310(a), which prohibits following too closely, is unconstitutionally vague.  (Doc. 39, 40).  All defendants also move to suppress the marijuana, firearms, ammunition, and the statements made by the defendants after arrest, as fruits of unlawful detention.  (Doc. 30, 32, 33).  Specifically, the defendants argue that the detention following the traffic stop was unlawful because Trooper Short did not have reasonable suspicion to prolong the traffic stop to obtain a dog sniff.  As a result, the defendants request that the Court suppress all fruits of the search and the defendants' statements to police following arrest.  The government filed responses (Doc. 46, 47) and submitted Trooper Short's written report and a CD with videos from Short's

patrol car. The government argues that Trooper Short had reasonable suspicion to extend the traffic stop to await the dog sniff.

The Court conducted a hearing and heard testimony of three witnesses, OHP Troopers Trent Short and Aaron Lockney and Bureau of Indian Affairs Special Agent Billy Stites. Agent Stites is also designated as an Agent with the United States Drug Enforcement Administration. In addition, the Court has considered the parties' briefs, oral arguments, and exhibits (Doc. 47-1, 47-2; Government Exhibits 1, 2, 3; Defendants' Exhibits 2 and 4).

## II. Analysis

### A. Suppression Proceedings

The purpose of suppression proceedings is to "determine preliminarily the admissibility of certain evidence allegedly obtained in violation of defendant's rights under the Fourth and Fifth Amendments." *See United States v. Merritt*, 695 F.2d 1263, 1269 (10th Cir. 1982). A motion to suppress is governed by Rule 12. *See* Fed. R. Crim. P. 12(b)(3)(C). Pursuant to Rule 12(d), "[w]hen factual issues are involved in deciding a motion, the court must state its essential findings on the record." This opinion shall serve as the Court's essential findings on the defendants' suppression motions.

### B. The Initial Stop

The Fourth Amendment guarantees citizens the right "to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. CONST. amend. IV. Those protections apply to investigatory stops. When a law enforcement officer performs an investigative detention of a person, it is referred to as a *Terry* stop. *See United States v. Hernandez*, 847 F.3d 1257, 1267-68 (10th Cir. 2017) (citing *Terry v. Ohio*,

392 U.S. 1, 21 (1968)). "Because a *Terry* stop is less intrusive than an arrest, the suspicion required to make such a stop is less demanding than what is required for an arrest." *Id*. at 1268. Still, such a detention is only permissible when an officer has "specific and articulable facts and rational inferences drawn from those facts giving rise to a reasonable suspicion that [the defendant] was involved in criminal activity." *Id*. "A valid traffic stop must be based on an observed traffic violation or a reasonable articulable suspicion that a traffic or equipment violation has occurred or is occurring." *United States v. Cline*, 349 F.3d 1276, 1286 (10th Cir. 2003) (internal quotation marks omitted) (*citing United States v. Callarman*, 273 F.3d 1284, 1286 (10th Cir. 2001)).

Trooper Short has been a state trooper for six years. He is assigned to I-44, to stop cars for traffic violations, to work crashes, and to enforce tolls. He has had interdiction training, which focused on "[c]riminals on the highways, traffic stops, [and] tendencies." His typical procedure in making traffic stops includes performing "on board checks" to make sure the driver's license is valid and verifying insurance and registration. Short has extended traffic stops between 20 and 30 times to await a dog sniff. Short initially testified that 100% of those times, the dog alerted to the presence of narcotics and that his suspicions were never unfounded when he had extended a stop for a dog sniff. On cross-examination, he admitted that, at least once, the sniffing dog alerted and drugs were *not* found.

According to Short's testimony, immediately before the February 6, 2019 stop, Short parked his patrol car just before the eastbound I-44 toll plaza at Vinita, Oklahoma. Short testified that his car was parked perpendicular to the traffic lane where vehicles, traveling northeast on I-44, exit to pay toll. Short testified that his car was facing east, and

he was watching through the passenger side window for vehicles coming toward him as they exited to pay toll. According to his testimony, he was parked with his driver's side door perpendicular to a crash barrier. *See* Government Exhibit 3. He indicated in his report that he was "watching for unsafe lane changes, following to [sic] close as well as toll violations." (Doc. 47-2 at 2). His report further indicates that, at approximately 1:05 p.m., he saw the RV driven by Near exit to pay toll. (*Id.*).[1] Short reported that the RV "was following a tractor trailer into the toll zone at less than 1/2 car length of the [RV]." (*Id.*).

Trooper Short testified that he first saw the RV from about 100 to 150 yards away from his patrol car.[2] All he could see was the driver's side headlight of the RV, behind a semi that was traveling toward Short's position. Based on that, he estimated that the RV was less than an RV's length from the semi in front of it and that the RV was traveling between 40 and 60 miles per hour. His written report did not record any estimate of the RV's speed, and he was not utilizing the radar gun in his patrol car. Short subsequently indicated that his estimate of the RV's speed was really based on the speed of the semi, which "was slowing" in front of the RV:

> "So I would guess the speed I would go off of would be the semi's speed because that would be what I could more, I could see at the time better to get the speed."

[1] The Report of Investigation, under "Charges," lists a time of 1:45 on February 6, 2019. However, the time identified at the outset of the "Facts" is 1:05.

[2] Trooper Short's estimate of the distance was called into doubt when Ms. Elfman's counsel pointed out on cross-examination that the distance key of the government's aerial exhibits does not match Short's testimony regarding the relative locations of the vehicles. Thereafter, Short equivocated about his distance estimates, ultimately asserting that he was "more sure of where [the RV] was [when Short first saw it] versus the feet and yard."

5

The traffic violation was not video recorded. Trooper Short acknowledged that he could have directed his patrol car's dash camera toward oncoming traffic as he was watching for violations, but he did not.

Short testified that, after he observed the RV commit a traffic violation, he followed the RV into the toll plaza lanes, allowed the RV to pass through the cash toll lanes and pay toll, then Short pulled the RV over. Short testified at length as to the precise details relating to the stop, which included his testimony that he drove his patrol car through the toll plaza to make the traffic stop:

> Q. . . . Using Government's Exhibit 3, could you describe what you did once you saw the violation?
>
> A. I allowed the motor home to proceed towards the cash lanes, which is in the same direction as the semi is traveling on the screen displayed here, allowed him to proceed towards the cash lanes, pay his toll, and then I proceeded in behind him and activated my lights.
>
> Q. And, so, using the exhibit and making an annotation, can you show where you drove your cruiser? . . .
>
> A. That specific day there's a lane right here, (indicating) that allows us that's not always open. . . . So I think - - I believe there's four lanes that are most of the time open and then the outside lane is a fifth lane that they can open in peak travel times, holidays. So I would have driven through, there's some cones right there.
>
> Q. Ok. And, for the record, the trooper has put a green mark on the far right side of the toll plaza where he would have driven his cruiser through to make the traffic stop.

*See* Government Exhibit 3 (Doc. 58-2 at 3); *see also* Screen Capture of Officer Short's green marking of the location he drove his patrol car (Doc. 58-4 at 2).

The government has provided dash camera video from Trooper Short's patrol car. The foregoing testimony of Trooper Short is directly contradicted by the video of the traffic stop, which plainly shows that he did *not* drive through the toll plaza lanes to initiate the traffic stop. Instead, the video – which begins with Trooper Short at a position *outside of the toll plaza*, approximately next to the toll booth – plainly depicts Short driving outside of the barrier separating the toll plaza from the Pikepass through lanes. He drove his patrol car along the outside of the barrier, to the area where the barrier ends and toll traffic is entering back onto the highway, and then he turned the patrol car around the end of the barrier, into the lanes coming out of the toll plaza, to make the stop.

The discrepancies between the video and documentary evidence and Trooper Short's testimony – whether due to mistaken memory or a veracity issue – cast somewhat of a cloud on the reliability of his testimony. The fact that he drove his patrol car outside of the barrier instead of through the toll lanes (as he incorrectly testified) also calls into question his testimony that his vehicle was perpendicular, facing the lane entering the toll plaza, while watching approaching toll traffic through his passenger side window.[3]

As noted, the Court has reservations about the reliability of Trooper Short's testimony regarding the details of the stop. However, other than asserting that the initial stop was premised upon a traffic statute that is void for vagueness (which will be discussed

---

[3]     To square the video of Trooper Short driving his vehicle on the outside of the barrier separating the through lanes from the toll plaza with his testimony of where he was parked when he saw the RV and witnessed a traffic violation, Short would have had to turn his vehicle around approximately 270 degrees to drive outside of the barrier toward the toll booth, instead of just angling his vehicle slightly left into the exit lane directly in front of him and following the RV through the toll plaza. *See* Doc. 58-4 at 5.

below), the defendants do not otherwise challenge Short's basis for initiating the traffic stop. Short testified that he had no doubt that the RV was following the semi in front of it too closely given the fog and the RV's speed, and Mr. Near himself stated in the video that he was "too close." (*See* Video at 3:02-09). Thus, for purposes of this opinion, the Court will assume that Short had justification to initiate the stop based upon observing Near following too closely, in violation of *Okla. Stat.* tit. 47, § 11-310(a). That statute provides:

> "The driver of a motor vehicle shall not follow another vehicle more closely than is reasonable and prudent, having due regard for the speed of such vehicles and the traffic upon and the condition of the highway."

*Okla. Stat.* tit. 47, § 11-310(a).

Ms. Elfman and Mr. Wright assert a void-for-vagueness challenge to § 11-310(a). They correctly note that now-Justice Gorsuch raised in a Tenth Circuit concurrence a question as to whether the Oklahoma statute might be vague, *see United States v. Law*, 572 F. App'x 644 (10th Cir. 2014) (unpublished). However, the Tenth Circuit has rejected void-for-vagueness arguments like those asserted here. In *United States v. Hunter*, 663 F.3d 1136, 1141 (10th Cir. 2011), the defendant was stopped for following a semi too closely, in violation of *Kan. Stat.* § 8-1523(a), which is identical to Oklahoma's § 11-310(a). The defendant in *Hunter* argued that the statute was unconstitutionally vague "because the term 'reasonable and prudent' is too subjective to inform ordinary drivers as to its meaning, and the statute does not establish minimum standards to guard against discriminatory enforcement." *Id.* The Tenth Circuit rejected the defendant's argument:

> "[T]he void-for-vagueness doctrine requires that a penal statute define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not

encourage arbitrary and discriminatory enforcement." When a court considers a vagueness challenge to a penal statute, it must begin with "the presumption that the statute comports with the requirements of federal due process and must be upheld unless satisfied beyond all reasonable doubt that the legislature went beyond the confines of the Constitution." And, "[c]ourts should remain ever mindful that 'general statements of the law are not inherently incapable of giving fair and clear warning.'" "[A]ll that is required is that the language 'conveys sufficiently definite warning as to the proscribed conduct when measured by common understanding and practices....'" With respect to the statute in question, we must also keep in mind that this is a misdemeanor traffic regulation statute, enacted for the safety of the driving public. . . .

[I]dentical or very similar "reasonable and prudent" standard statutes are ubiquitous throughout the United States, and have been uniformly upheld against constitutional challenges. As these cases make clear, imprecision in statutes such as the one here simply build in needed flexibility while incorporating a comprehensible, normative standard easily understood by the ordinary driver, and giving fair warning as to what conduct on his or her part is prohibited. Further, references in these statutes to considerations such as speed, traffic and road conditions, channel enforcement.

For those same reasons, we hold that *Kan. Stat. Ann.* § 8–1523(a) is not unconstitutionally vague as applied to Mr. Hunter.

*Hunter*, 663 F.3d at 1141–42 (internal citations and footnotes omitted).

In an earlier unpublished decision, a panel of the Tenth Circuit similarly declined to find *Okla. Stat.* tit. 47, § 11-310 unconstitutionally vague. *See United States v. Borrego*, 66 F. App'x 797, 800 (10th Cir. 2003) (unpublished) (*Okla. Stat.* tit. 47, §§ 11-309, 11-310, and 11-804 were not unconstitutionally vague as applied). Based upon the reasoning of *Hunter*, which involved a statute identical to the Oklahoma "following too closely" statute, as well as *Borrego*, the Court concludes that the Oklahoma statute is not unconstitutionally vague as applied here.

**C.      Prolonging the Stop to Await a Dog Sniff**

Even where the initial stop is lawfully premised upon reasonable suspicion, the scope of the investigative detention "must be carefully tailored to its underlying justification." *Florida v. Royer*, 460 U.S. 491, 500 (1983); *see also Terry*, 392 U.S. at 20. The Supreme Court has held "that a police stop exceeding the time needed to handle the matter for which the stop was made violates the Constitution's shield against unreasonable seizures." *Rodriguez v. United States*, __ U.S. __, __, 135 S. Ct. 1609, 1612 (2015). "A seizure justified only by a police-observed traffic violation, therefore, 'become[s] unlawful if it is prolonged beyond the time reasonably required to complete th[e] mission' of issuing a ticket for the violation." *Id.* (quoting *Illinois v. Caballes*, 543 U.S. 405, 407 (2005)). "Because addressing the infraction is the purpose of the stop, it may 'last no longer than is necessary to effectuate th[at] purpose.'" *Id.* at 1614 (citations omitted). "Authority for the seizure thus ends when tasks tied to the traffic infraction are – or reasonably should have been – completed." *Id.*

An officer may make ordinary inquiries such as "checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance," which serve the same objective as enforcement of the traffic code. *Id.* at 1615. "A dog sniff, by contrast, is a measure aimed at 'detect[ing] evidence of ordinary criminal wrongdoing.'" *Id.* (citation omitted). "Lacking the same close connection to roadway safety as the ordinary inquiries, a dog sniff is not fairly characterized as part of the officer's traffic mission." *Id.* "The critical question . . . is not whether the dog sniff occurs before or after the officer issues a ticket . . . but

whether conducting the sniff 'prolongs' –i.e., adds time to—'the stop.'" *Id.* at 1616. An officer "may conduct certain unrelated checks during an otherwise lawful traffic stop, . . . [but] he may not do so in a way that prolongs the stop, absent the reasonable suspicion ordinarily demanded to justify detaining an individual." *Id.* at 1615.

Here, Trooper Short's checks of Near's driver's license and running the Oklahoma Law Enforcement Telecommunications System (OLETS) for other issues, such as warrants, registration, and insurance, were within the proper scope of the traffic stop. Short's questioning of Near and Wright regarding travel plans was also reasonably within the scope of the traffic stop, and those questions – which were asked while Trooper Short awaited returns on the routine traffic checks – did not unnecessarily prolong the stop.

The stop was prolonged, however, to further question Near about the presence of illegal contraband, to request consent to search, and to await a dog sniff of the RV. Thus, the principal question here is whether Short had reasonable suspicion to prolong the stop to await the dog sniff. *See Rodriguez*, 135 S. Ct. at 1612-16. Short gave Near the warning, shook his hand, and Near began to exit the vehicle at the 9:30-35 mark of the video. Near's left leg was still in the patrol car passenger side when Short immediately and in a loud voice said, "Hey Jason, Jason, you got one more minute?" (Video at 9:36). Near was still standing inside the opened door of the patrol car and then sat back down in the patrol car, as he said, "oh, yes sir." (*Id.* at 9:36-9:41). Short then questioned Near as to whether there were firearms, drugs, bombs, grenades, or anything illegal in the RV, and Near answered "No sir." Short requested to search the RV, and Near declined, saying he just wanted to be

on his way. At that time, Short told him that he was "not free to go" and was being detained. (Video at 10:08). [4]

Approximately eight minutes and 22 seconds after Short informed Near that he was not free to go, another OHP patrol car arrived at the scene of the detention. (*Id.* at 18:30). Trooper Short then exited his patrol car and walked to the rear of the vehicle. (*See id.* at 18:56). At the 20:32 mark of the video – more than 10 minutes after Short informed Near that he was being detained and almost 20 minutes after Short had initiated the traffic stop – an officer (OHP Trooper Aaron Lockney) opened the passenger door where Near was sitting and, without introduction, stated that the officer is "gonna run a dog on this" and then he warned Near that "if there's even a crumb of marijuana in there, I'm jailing everybody and your dog's going to the pound." When Near asked why they were going to search when he did not give consent and had done nothing wrong, the officer repeated "I'm fixin' to run my dog on there . . . If he alerts, we search this and find even a crumb of

---

[4] The government characterizes Short's continued questioning of Near after issuing the warning as a consensual encounter rather than a continuation of the investigatory detention. To determine whether a police encounter is consensual or a seizure, the courts consider the "historical facts" of the encounter and "apply an objective test, considering whether a reasonable person would have felt free to leave or terminate the encounter." *United States v. Gaines*, 918 F.3d 793, 796 (10th Cir. 2019). In this case, as established by the video, Near had sat in the patrol car for several minutes, and he was not even out of the car before Short stated, "Hey Jason, Jason, you got one more minute?" The patrol car's flashing lights were still activated at that time. (Video at 9:36). It does not appear that a reasonable person would have felt free to terminate the encounter under those circumstances. Nonetheless, the Court need not determine whether Near's encounter with Short turned consensual, because approximately 30 seconds after Near first began to exit the vehicle, Short unequivocally seized Near when he announced that Near was "not free to go" (*id.* at 10:08), and the defendants were thereafter detained for over 12 minutes to await a dog sniff. Trooper Short still must have had reasonable suspicion to further prolong the detention for a dog sniff.

marijuana, everybody in there is going to jail." (Video at 20:50-21:03). An officer with a leashed dog is then seen walking next to the passenger side of Short's patrol car at the 22:25 mark of the video. It thus appears that the dog sniff began over twelve minutes after Short informed Near that he was detained and approximately 20 minutes after Short pulled over the RV.

At 24:33 in the video, the dog appeared in Near's passenger window again, walking toward the back of the patrol vehicle. About a minute later, an officer opened the passenger door and informed Near that the dog alerted and "indicated for one of four odors," which are "marijuana, cocaine, methamphetamine, or heroin," so the officers would search the RV. Officer Lockney then stated, "Like I said before, if we find anything in there, I'm going to personally jail you all." (Video at 25:55-59). The officers proceeded with the search and found the marijuana. Mr. Near was removed from Short's vehicle and placed in handcuffs. (*Id.* at 33:25-45). The video ends after 58 minutes. A second video continues for another nine minutes and reflects that Short followed someone driving the RV to the OHP Troop L Headquarters in Vinita. (*See* second video).

The defendants assert that the extension of the traffic stop and detention to await a dog sniff were unlawful because Trooper Short did not have the reasonable suspicion necessary to further detain. Reasonable suspicion is "'a particularized and objective basis' for suspecting the person stopped of criminal activity." *Ornelas v. United States*, 517 U.S. 690, 696 (1996) (quoting *United States v. Cortez*, 449 U.S. 411, 417-418 (1981)). "The principal components of a determination of reasonable suspicion or probable cause will be the events which occurred leading up to the stop or search, and then the decision whether

these historical facts, viewed from the standpoint of an objectively reasonable police officer, amount to reasonable suspicion or to probable cause." *Id.* The officer "must be able to articulate something more than an 'inchoate and unparticularized suspicion or 'hunch.'" *United States v. Sokolow*, 490 U.S. 1, 7 (1989) (quoting *Terry*, 392 U.S. at 27). "Reasonable suspicion . . . is dependent upon both the content of information possessed by police and its degree of reliability," and "[b]oth factors—quantity and quality—are considered in the 'totality of the circumstances—the whole picture . . . that must be taken into account when evaluating whether there is reasonable suspicion.'" *Alabama v. White*, 496 U.S. 325, 330 (1990) (quoting *Cortez*, 449 U.S. at 417).

The government claims that Near's behavior, as seen in the video during the traffic stop, gave rise to Short's reasonable suspicion of criminal behavior. Specifically, the government contends that Trooper Short had reasonable suspicion based upon "implausible travel plans," "extreme nervousness," "odd and ingratiating behavior," and Near's "attention on the RV." (*See* Doc. 47).

Because of the inside-pointing camera in Short's patrol car, Near is in the video frame for virtually the entire traffic stop. While Trooper Short cannot be seen in his entirety, his testimony was that he was entering information and awaiting returns on his OLETS checks during the time that he was conversing with Mr. Near prior to issuing a warning. It is thus not believable that he was continuously staring at Mr. Near every second that they were in the patrol car together. In addition, when Trooper Short was not in the patrol car (from approximately 5:40 to 7:08 when Short exited the patrol car to question Mr. Wright), he obviously would not have observed Mr. Near. With those caveats in mind,

the Court will now turn to the evidence relating to the factors that the government alleges gave rise to reasonable suspicion of criminal activity.

### 1.    "Implausible Travel Plans"

The government argues that "Near gave implausible travel plans about a trip from western New York to the Grand Canyon and back, in an RV, in the middle of February, to stay at the Grand Canyon for a total of a day and a half." (Doc. 47 at 12). In addition, the government represents that "Trooper Short noted in his report [that] the travel plans were implausible both because of the extreme amounts of driving for such a limited payoff, and because of the bad weather in the Midwest at the beginning of February." (*Id.* [citing Ex. b at 2]).

The evidence falls far short of supporting the arguments made in the government's brief. When Short asked Near where he and his travel companions were coming from, Mr. Near responded that he, his wife, and cousin were coming from the Grand Canyon, where they had spent a day and a half. He volunteered that they were escaping colder "thirty below" weather in New York, then explained that he and his wife wanted to travel because she has cancer, and his cousin came along because he had never seen the Grand Canyon. He also indicated that they had "a week" to travel. (Video at 5:22-5:23). Trooper Short then exited the patrol car, approached the passenger side of the RV, and had a brief discussion with Mr. Wright. Wright provided his identification and likewise told Short

that they were coming from the Grand Canyon.  Short asked Wright how long they were there, and Wright reported that they were there a "few days" or "two days."[5]

The evidence regarding the defendants' travel plans does not support a finding that Trooper Short considered the plans to be implausible at the time of the traffic stop. Contrary to the government's contention in briefing that Trooper Short "noted in his report" alleged "implausible travel plans" due to "extreme amounts of driving," a "limited payoff," and "bad weather in the Midwest at the beginning of February" (Doc. 47 at 12), the report does not identify any of those things.  (*See* Doc. 47-2).  Rather, the report's only reference to travel plans was the following notation:

> NEAR stated that they were coming from the Grand Canyon and had been there a day and a half.  While awaiting returns SHORT returned to the motor home to see if the passenger would allow SHORT to check his ID.  KEVIN WRIGHT was identified by his New York drivers license.  WRIGHT stated that they had been at the Grand Canyon for 2 days.  SHORT returned to my unit expecting the returns to be back and finish the contact.

(*Id.* at 3).

Moreover, Short's testimony regarding the trip significantly downplayed any alleged implausibility or bizarreness of Near's and Wright's statements about a trip to the Grand Canyon.  On direct examination, Trooper Short was asked to estimate the mileage of a trip from the Great Lakes area of New York to the Grand Canyon, and he responded "approximately 2200 miles one way."  However, there was no indication – either in his testimony, his report, or in the video – that he noted, calculated, or researched that distance during the traffic stop, rather than in preparation for the hearing.  Short indicated on direct

---

[5]      The audio is unclear during parts of Short's brief conversation with Mr. Wright.

examination that the trip "seemed implausible" and "like it didn't make sense," but he offered no factual explanation as to why it did not make sense.

On cross-examination, Trooper Short acknowledged that "there's certainly nothing unusual about a person or a group of people traveling to the Grand Canyon," as "[i]t's one of the top destinations in the United States," which "people from all over the world travel thousands of miles to see." He further testified that "there was time to spend that day and a half at the Grand Canyon," and there were "no inconsistencies" between Mr. Near's statements and Mr. Wright's statements about the Grand Canyon. Short stated that he has never been to the Grand Canyon and "wouldn't know" the length of the average stay of a tourist to the Grand Canyon.

While Short testified that road conditions were "less than optimal," he acknowledged that there was much traffic traveling through Oklahoma both east and west and that "the roads were passable between the Grand Canyon and New York." Short also testified that there was nothing suspicious in his mind about a person who was suffering from cancer wanting to see the Grand Canyon. He understood that it was "considerably colder in New York than it was in the Midwest and the West coast," such that Near's explanation that the defendants wanted to escape the cold in New York was not suspicious, and he agreed that it was reasonable that a person would want to go to the Grand Canyon if they had never visited.

In *United States v. Lopez*, 849 F.3d 921, 927 (10th Cir. 2017), the court noted that the defendant's purportedly implausible travel plans "held together rather well" and did

not provide a basis for reasonable suspicion to prolong a traffic stop to await a drug dog.

*Id.* at 926. The court reasoned as follows:

> Perhaps additional questioning of Defendants (particularly if they were not together) would have elicited internal contradictions, inconsistencies between their stories, or inexplicable vagueness. We have said that such flaws in purported travel plans can be a significant factor in assessing reasonable suspicion. But [the highway patrol officer] did very little to pursue his suspicions, and he uncovered no flaws of that nature. Although our precedents may not be totally consistent in that regard, *we have generally been reluctant to give weight in the reasonable-suspicion analysis to unusual travel purposes, at least absent lies, inconsistencies, or the like.*

*Id.* at 927 (emphasis added) (internal citations omitted). Here, Trooper Short testified that there were no inconsistencies. He also failed to articulate – either in his written report or during his testimony – any factual basis for believing the defendants' stated travel plans were untruthful, inconsistent, or bizarre. And he did nothing to pursue any suspicions by way of additional questioning of the defendants relating to travel.

The government's contention that the stated travel plans gave rise to reasonable suspicion is not supported by the record evidence or the Court's view of the testimony and demeanor of Trooper Short.

### 2. "Nervousness"

The government relies upon Near's nervousness to support its argument that Short had reasonable suspicion of criminal activity. The Tenth Circuit has "consistently assigned this factor limited significance because its measure is so subjective and innocent people can vary widely in how they respond to an encounter with police." *Lopez*, 849 F.3d at 925 (citing *United States v. Pettit*, 785 F.3d 1374, 1378-79 (10th Cir.), cert denied, 136 S. Ct. 282 (2015)). "Ordinary nervousness alone cannot serve as the basis for reasonable

suspicion." *Pettit*, 785 F.3d at 1380. Thus, the courts "look only for signs of nervousness 'beyond those normally anticipated during a citizen-police encounter.'" *Id.* (quoting *United States v. Salzano*, 158 F.3d 1107, 1113 (10th Cir. 1998)). "Only *extreme* nervousness can substantially contribute to reasonable suspicion." *Lopez*, 849 F.3d at 925-26 (citing *Pettit*, 849 F.3d at 925). The courts "'require specific indicia that the defendant's nervousness was extreme' and will not give credit to 'an officer's naked assertion.'" *Pettit*, 785 F.3d at 1380 (quoting *United States v. Simpson*, 609 F.3d 1140, 1148 (10th Cir. 2010)).

Here, the government alleges that there are several indicia that Near's nervousness was "extreme." At the hearing, in an effort to bolster its argument that Short had reasonable suspicion to believe a crime was being committed, the government argued that "Mr. Near's behavior was so bizarre in so many ways that the trooper couldn't ignore them." The Court has reviewed the video numerous times, and the video does not support the government's claim of bizarre behavior or nervousness rising to an extreme level.

Trooper Short only noted two indicia of nervousness in his written report: that Near's carotid pulse "was very pronounced and easily visible in his neck," and "his sweatshirt [appeared] to be rapidly rising and falling as [Near] was taking fast short breaths." (*See* Doc. 47-2 at 3). The government attempts to add to the written report by providing a post-hoc description of each lip-lick, laugh, inhale or exhale, and comment by Mr. Near, as seen from a critical review of the video. (*See* Doc. 47). The Court does not find the government's descriptions to be objective or a fair summary of Near as depicted on the video.

A pronounced carotid and rapid breathing can be signs of nervousness, but many people who encounter police officers will show such signs of nervousness. Near was wearing a hooded sweatshirt that appeared to obscure at least part of the left side of his neck throughout the video. While his breathing rate appeared to be increased in the first minute of sitting down in Trooper Short's patrol car, that does not put Near in a position that is beyond that normally anticipated during a police encounter. Moreover, the increased breathing rate that can be seen at the beginning of the encounter followed Near exiting the RV, walking to the patrol vehicle, and sitting down in the front seat next to an OHP Trooper. In his testimony, Short acknowledged that it is normal for drivers to be nervous when stopped by a trooper. In any event, throughout much of the video, Near appears quite calm and collected, turns his head to look directly toward Trooper Short's face in answering numerous questions, and otherwise appears calm after the initial nervousness upon sitting in Trooper Short's vehicle.

According to counsel for the government, Mr. Near's lip-licking was especially pronounced. When asked on direct examination about his observations about "Mr. Near's lips that day," Trooper Short testified that Mr. Near "constantly kept licking them like his mouth was dry or a person would have cotton mouth." The government asked the Court to view six still frames from the video in which Mr. Near's tongue is out of his mouth. While Mr. Near licked his lips a number of times, the video does not depict that he did so "constantly," as Short claimed in his testimony, or that it was pronounced in the context of

his several minutes in the patrol car with Trooper Short. The lip-licking was not so pronounced that Short bothered to note it in his written report. (*See* Doc. 47-2 at 3).[6]

The government also solicited testimony from Trooper Short that Mr. Near "was messing with the papers [Near brought into the patrol car] the whole time." The video is not consistent with that claim. While his hands are not visible in most of the video, his arms and shoulders are and, for most of the time preceding Short's announcement that Near was being detained, Near does *not* appear to be fidgeting with the papers in his lap. Aside from a few seconds when he appears to look toward the papers in his lap, each time he was "messing" with the papers was directly responsive to Short's questions or he was handing Short documents or receiving documents back from Short. (*See, e.g.,* Video at 2:38 [Near approaching patrol car with papers in hand]; 3:08-3:18 [Near looked toward lap, then handed Short something, Short handed it back, and Near moved it down toward his lap]; 4:03 [Near looks towards lap for a few seconds]; 7:20 [After Short asked if the RV is a Ford, Near responded that it is a Fleetwood Southwind with Ford components, then Near looked down toward his lap, appeared to be reading, then confirmed the type of vehicle];

---

[6]    The government critiques every facial expression, breath, and tongue movement of Mr. Near while in the patrol car during the video-recorded traffic stop. Humans – whether they are drivers involved in an investigative stop or they are experienced and trained highway patrol officers – sometimes breathe rapidly, get nervous, stick their tongues out unconsciously, make odd faces, and even appear to have dry mouths. (*See, e.g.,* Video at 00:03-13, 00:20-23, 00:30-33, 00:42-46 [depicting Trooper Short's facial, mouth, and tongue movements during the short time that *his* face is visible on the dash camera]). Absent "extreme" exhibitions of such traits, those human behaviors are not reliable indicia of illegal activity and are properly afforded only limited weight.

8:45 [Near looked towards his lap for a few seconds]; 9:05-9:20 [Short handed something to Near, and Near appeared to put it down toward the stack of papers in his lap]).

Even after testifying about the increased breathing, pulsing carotid artery, lip-licking, and alleged paper shuffling, Trooper Short testified that he did not find any one of those factors to be significant:

> Q.    Overall, the body language that you saw from Mr. Near's responses to questions, how did you interpret all that body language together?
>
> A.    Well, individually, nothing. . . .

"But all together, [Short] felt like that [Near] was hiding something" and "interpreted it that [Near] was nervous and just rambling because he didn't want there to be silent in the car, silence in the car." Short further testified that, when he shook Near's hand after handing him the warning, it was "wet to the touch," which he took to be an "extreme side of nervousness" as if Near "was worried about something." Short had never met Near before and thus had no idea whether Near's behavior was abnormal for him.

In any event, all of these behaviors the government relies upon were exhibited before Trooper Short testified that Near was "free to go" and he let Near begin to exit the vehicle. It thus appears that Short himself believed at the time that any of those behaviors he had observed did not yet establish the reasonable suspicion needed to extend the stop to await a dog sniff.

The Court credits Trooper Short's testimony that he believed that Near was nervous, and nervousness may be considered as a factor, though it is of limited significance "because its measure is so subjective and innocent people can vary widely in how they respond to

an encounter with police." *Lopez*, 849 F.3d at 925.  The Court has reviewed all of the evidence and finds Short's testimony and the government's characterization of Near's behavior as "bizarre" or his nervousness as "extreme" are not supported by the evidence. While the court must accord deference to an officer's judgment, the deference "is not unlimited." *United States v. Simpson*, 609 F.3d 1140 (10th Cir. 2010).  "Some facts must be outrightly dismissed as so innocent or susceptible to varying interpretations as to be innocuous." *Id.* (citation omitted). "[T]he officer must point to specific, articulable facts." *Id.* (citation omitted).

In addition, Short's feelings that Near may be "hiding something" or "was worried about something" do not rise to the level of a "reasonable suspicion supported by articulable facts that criminal activity 'may be afoot,'" and do not amount to articulation of anything more than an "inchoate and unparticularized suspicion or 'hunch.'" *See Sokolow*, 490 U.S. at 7.  The Court accordingly affords little weight to the nervousness factor in this case.

### 3.     "Odd and Ingratiating Behavior"

The government cites alleged odd and ingratiating behavior by Near.   The government includes Near's complimenting Short's patrol car (a black Dodge Charger) and the Trooper's AR-15 rifle in the backseat.  (Doc. 47 at 18).  Short testified that Near complimented the Charger and said it was nice.  With respect to the AR-15, Short testified

that Near commented on the gun "when he was getting in."[7]  Short testified that "[m]ost people don't talk about the guns that they see, so" the comment was not "normal."  Short did not note the comments about the car and gun in his written report, and he did not indicate in his testimony that those comments gave rise to a particularized suspicion of criminal activity.  Rather, he merely testified that he "felt like [Near] was being overly friendly, trying to maybe get on my good graces that specific day."  But Short admitted that different people exhibit different levels of friendliness along a spectrum, and the fact that a person is more friendly or less friendly than others is not an indicator of criminality.  He also testified that Near's comments on his Charger and gun were "not indicative of criminal behavior."

As further indicia of purportedly odd behavior, the government contends that Mr. Near made "frequent jokes and laugh[ed] heartily" (Doc. 47 at 18) and, at the hearing, the government characterized Near as "trying to be a stand-up comedian."  Short's report did not mention anything inappropriate about Near laughing or joking, and the video does not support the government's exaggerated characterization of Mr. Near's conduct.  Mr. Near chuckled a handful of times, and he repeated the adage that the "two good days in a boater's life [are] when you buy it and when you get rid of it." (Video at 3:55).  That "joke" and the chuckle that followed were in response to *Trooper Short* referencing the funny acronym often repeated about owning a boat: "break out another thousand."  (*Id.* at 3:48).  Trooper

---

[7]    The video plainly depicts that Near commented on the gun as he was beginning to *exit* the patrol car after receiving the traffic warning, rather than when he was "getting in" the car.  The Court considers this discrepancy in Short's testimony to be insignificant.

Short made similar joking comments at other times in the video – about being "normally pretty good" in guessing weight "but the last time I guessed a guy I put him at 190 and he goes 'oh my god, I'm like 140.'" (*Id.* at 8:10). This is consistent with Short's testimony that, during traffic stops, he tries to make small talk to make stops "not impersonal."

The evidence does not support a finding that Short considered such behavior to give rise to any reasonable suspicion of criminal activity before he extended the stop for the dog sniff. Moreover, the allegedly "odd" behavior seems to duplicate the nervousness factor rather than serve as a separate factor justifying reasonable suspicion. As with the other alleged indicia of nervousness, the Court finds this factor should be afforded little weight.

### 4. "Attention on the RV"

The government also relies upon Mr. Near's conduct upon Trooper Short continuing his questioning of Near after issuing the warning. According to the government's briefing, the "Trooper watched as Near's eyes went directly to the RV while he denied" that there "was something illegal in the RV" or there were any firearms in the RV, and Short "reasonably took Near's glances at the RV during these questions as an unconscious signal that Near was concerned about what was in the RV." (Doc. 47 at 19). Short testified that, "[w]hen [Short] would ask specific questions [Near] appeared like he was looking back at the RV," which he interpreted as "[Near] knew there was something in the car" and "was worried about the car." On cross-examination, Short acknowledged that the RV filled nearly the entire view through the front windshield of his patrol car and that, any time throughout the encounter when Short or Near were not looking at one another, they would be facing forward to the RV. He also admitted that, whenever Near was facing forward

rather than looking directly at Short, Short could not see Near's eyes to determine precisely what he was looking at. In any event, the alleged glancing at the RV fits within the nervousness factor, rather than as a separate standalone indicator that would give rise to reasonable suspicion, and the Court accordingly affords it only limited weight.

## 5. Totality of the Circumstances

Considering the totality of the circumstances, the Court finds that Trooper Short did not have reasonable suspicion, supported by articulable facts, of criminal activity, as required to extend the investigatory detention to await a dog sniff of the RV. The Court has viewed the video from the patrol car numerous times and finds that the evidence does not support the government's contentions. The government's alleged suspicious indicators and the particularized objective facts, considered individually or in combination as part of the totality of the circumstances, do not establish that Trooper Short had reasonable suspicion to prolong the stop to await the drug dog. Short declined to articulate any basis for awaiting the dog sniff when Near specifically asked him "May I ask what I've done wrong, sir?" (Video at 18:36). Instead, Short answered, "Um I'll tell you as soon as we're done." (*Id.* at 18:38). He subsequently prepared a written report that referenced only rapid breathing and a pulsing carotid artery as suspicious factors.

Short also testified that he did not smell any drugs on Mr. Near, Ms. Elfman, or Mr. Wright and did not see any signs of drug trafficking when he approached the RV. He saw no signs of any other type of criminality, and the defendants did not appear to be hiding anything as Short approached the RV. Trooper Short's written report, testimony, and the video do not provide particularized objective facts that suffice to justify prolonging the

detention by more than 12 minutes to await the dog sniff. *See Lopez*, 849 F.3d at 928; *Rodriguez*, 135 S. Ct. at 1612-16. As a result, the evidence seized from the RV must be suppressed. *See Lopez*, 849 F.3d at 928.

### D.     The Post-*Miranda* Statements of Near and Wright

The government asserts that "[e]ven if the Court finds that Trooper Short lacked reasonable suspicion when he ordered the dog sniff, the Court need not suppress the statements obtained later that day at the Troop XA/L headquarters." (Doc. 47 at 21). Citing *Brown v. Illinois*, 422 U.S. 590 (1975), the government contends that the defendants' statements at the OHP headquarters were attenuated from the detention so as to purge any taint from the unlawful detention. (*See* Doc. 47 at 21).

Under *Brown*, "[i]n order for the causal chain, between the illegal arrest and the statements made subsequent thereto, to be broken, . . . the statement [must] meet the Fifth Amendment standard of voluntariness [and must also] be 'sufficiently an act of free will to purge the primary taint.'" 422 U.S. at 603. "*Miranda* warnings, by themselves, [do not] attenuate the taint of an unconstitutional arrest. . . ." *Id.*

> If *Miranda* warnings, by themselves, were held to attenuate the taint of an unconstitutional arrest, regardless of how wanton and purposeful the Fourth Amendment violation, the effect of the exclusionary rule would be substantially diluted. Arrests made without warrant or without probable cause, for questioning or "investigation," would be encouraged by the knowledge that evidence derived therefrom could well be made admissible at trial by the simple expedient of giving *Miranda* warnings. Any incentive to avoid Fourth Amendment violations would be eviscerated by making the warnings, in effect, a "cure-all," and the constitutional guarantee against unlawful searches and seizures could be said to be reduced to "a form of words." [Thus,] the *Miranda* warnings, alone and per se, cannot always make the act sufficiently a product of free will be break, for Fourth Amendment purposes, the causal connection between the illegality and the

confession. They cannot assure in every case that the Fourth Amendment violation has not been unduly exploited. . . .

The question whether a confession is the product of a free will . . . must be answered on the facts of each case. No single fact is dispositive. . . . The *Miranda* warnings are an important factor, to be sure, in determining whether the confession is obtained by exploitation of an illegal arrest. But they are not the only factor to be considered. The temporal proximity of the arrest and the confession, the presence of intervening circumstances, and, particularly, the purpose and flagrancy of the official misconduct are all relevant. The voluntariness of the statement is a threshold requirement. And the burden of showing admissibility rests, of course, on the prosecution.

*Brown*, 422 U.S. at 602-04 (internal citations omitted).

The government asserts that the statements of the defendants were taken at the OHP Headquarters at least an hour after the defendants were initially detained, rather than "on the roadway immediately following the illegal detention," such that there were several intervening circumstances, including the search, the arrests, the drive to the headquarters, waiting for the DEA agents, and the giving of *Miranda* warnings. (Doc. 47 at 21-22). The government has not met its burden of showing admissibility here. Special Agent Stites testified that, within an hour of being notified of the drug arrest, he began interviews of the defendants, but he could not recall, and the government did not introduce evidence of, the "specific times" involved, and his testimony principally focused on the *Miranda* warnings, which are insufficient alone to attenuate the statements from the taint of the Fourth Amendment violation.

The defendants were traveling home to New York when Trooper Short pulled their RV over. At no time between being pulled over on I-44 and giving their statements at the Troop L OHP Headquarters were the defendants free from the law enforcement encounter.

Near sat in Trooper Short's patrol car for over an hour. Ms. Elfman and Mr. Wright were also prevented from continuing their travels because the RV was stopped, then they were removed from the RV for it to be searched. All three were under arrest and in law enforcement custody at the time of their statements given within a few hours of arrest. The arrests themselves flowed from the poisonous fruits of the Fourth Amendment violation. The government has not identified any meaningful length of time or intervening event between the illegal detention and the defendants' statements given the same afternoon. *See, e.g., Brown*, 422 U.S. at 604-05 ("Brown's first statement was separated from his illegal arrest by less than two hours, and there was no intervening event of significance whatsoever"); *Kaupp v. Texas*, 538 U.S. 626, 633 (2003) (state's reliance on *Miranda* factor was not sufficient to attenuate where the defendant remained in the physical custody of a number of officers, requiring suppression of the confessions); *United States v. Maez*, 872 F.2d 1444, 1456-57 (10th Cir. 1989) (consent and post-*Miranda* warning and waiver statements given approximately 45 minutes after being taken into custody were not attenuated and thus the statements were excluded as fruits of the poisonous tree because the defendant remained in custody).

## III.  Conclusion

Based upon the Tenth Circuit's reasoning in *Hunter*, 663 F.3d 1136 and *Borrego*, 66 F. App'x at 800, *supra*, *Okla. Stat.* tit. 47, § 11-310 is not unconstitutionally vague as applied to Mr. Near. Accordingly, the motion of defendants Elfman and Wright to suppress the traffic stop on their void-for-vagueness argument (Doc. 39, 40) is **denied**. However, Trooper Short did not have a particularized and objective basis for suspecting criminal

activity before prolonging the traffic stop.  As a result, his authority for the seizure ended when the tasks tied to the traffic infraction were completed, and the detention of the defendants to wait for a dog sniff unlawfully prolonged the stop, in violation of the Fourth Amendment.  The defendants' post-arrest statements were not attenuated from the Fourth Amendment violation.  Accordingly, the defendants' Motion to Suppress the marijuana, firearms, ammunition, and post-arrest statements (Doc. 30, 32, 33) is **granted**.

SO ORDERED this 11th day of June, 2019.

JOHN E. DOWDELL, CHIEF JUDGE
UNITED STATES DISTRICT COURT